FILED

AUG 24 2015

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

IN THE UNITED STATES DISTRIC COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

REDSTONE INTERNATIONAL INC. )
)
Plaintiff, )
) Civil Action No. 5:15:CV-113
)
v. ) Judge Bailey
)
) JURY TRIAL DEMANDED
J. F. ALLEN COMPANY and )
AMEC FOSTER WHEELER PLC, )
)
Defendants. )

## COMPLAINT

AND NOW comes Redstone International Inc., by and through its undersigned counsel, and for its Complaint in this matter, states as follows:

### INTRODUCTION

This Complaint arises out of a construction project located in or about Mobley, Wetzel County, West Virginia, and asserts causes of action for breach of contract, tortious interference with contractual and other advantageous business relationships, and negligence.

### PARTIES

1.  The Plaintiff, Redstone International Inc. ("Redstone"), is a Pennsylvania corporation with its principal place of business at 732 McClellandtown Road, Suite 1, Uniontown, Fayette County, Pennsylvania.

2.  The Defendant J. F. Allen Company ("JFA") is a for-profit West Virginia corporation with its principal place of business at Buckhannon, Upshur County, West Virginia.

3. The Defendant Amec Foster Wheeler ("Amec") is a for-profit, British incorporated engineering and design firm that maintains places of business throughout the United States. Plaintiff's relations have been with the place of business located at 3800 Ezell Road, Suite 100, Nashville, TN 37211.

## SIGNIFICANT NON-PARTY AND PARTY RELATIONSHIPS

4. Upon information and belief, MarkWest Liberty Midstream & Resources, LLC ("MarkWest") is the owner of the Mobley, WV Marcellus Shale processing project (the "Project"), where the dispute arose.

5. MarkWest entered into a Design/Build contract with Defendant JFA for the construction of, *inter alia*, a retaining wall for the Project.

6. JFA, in turn, entered into a subcontract construction agreement (the "Subagreement") with Redstone, a copy of the relevant portions of which are attached as Exhibit A, and which is discussed in more detail below.

7. Defendant Amec is the design engineer that contracted with JFA to complete and oversee the implementation of the design of the retaining wall that is the subject of this dispute.

8. While Amec is presumably the "design" portion of the Design/Build team that contracted with JFA, Redstone does not have an independent contractual agreement with Amec for design services on this Project.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332 inasmuch as the parties are citizens of different states.

10. Venue lies in the Wheeling Division of the United States District Court for the Northern District of West Virginia inasmuch as the dispute arises solely out of incidents taking place on the Project located in Wetzel County, West Virginia.

## BACKGROUND

11. The Subagreement between JFA and Redstone called for Redstone to install, per Defendant Amec's design, 32,026.4 square feet of steel H-beam and concrete lagging wall and accompanying wall tieback anchors for a lump sum price of $6,584,687.77. This price was based upon a negotiated unit price of $189.99 per square foot of wall, as set forth on p. 64 of Ex. A.

12. Once construction commenced, it became apparent to all parties that the scope of the work would increase dramatically inasmuch as Defendants' square footage calculations proved incorrect given over excavation by JFA, and the size of the wall would ultimately exceed 38,000 square feet.

13. Per the Subagreement, Redstone submitted change order proposals to JFA seeking to increase the contract price to match the amount of work that was actually required.

14. That Redstone was within its rights to seek an increase in the contract quantity was evidenced both by the change order provisions in the General Conditions portion of its agreement, as well as the unit price measure agreed upon in Redstone's proposal as modified and ultimately accepted by JFA at the inception of the Subagreement.

15. However, JFA consistently refused to address Redstone's request for a change, essentially ignoring it until the eve of completion of the contract.

16. When Redstone had completed the entirety of its base contract as well as the vast majority of the extra work required to be completed because of the Defendants' faulty quantity calculations, JFA took the position that, because Redstone had agreed to a lump sum contract price for a specific square footage, it had essentially agreed to construct the wall at that price no matter how large the wall might grow to be.

17. Redstone pointed out to JFA the absurdity of its position given the fact that both JFA's boilerplate General Conditions and the modified proposal submitted by Redstone, which was signed and agreed to by JFA and incorporated into the Subagreement, anticipate the possibility of a change in size and provide the measure for calculating the accompanying cost associated with a change in size from the base contract square footage. JFA's response was to threaten to terminate Redstone from the job if Redstone did not continue to build additional wall without a change order.

18. When it became apparent that JFA had no intention of paying for the extra work performed by Redstone, Redstone halted further work on wall construction per its contractual right to do so.

19. Concurrently, on portions of the wall already constructed by Redstone, a number of wall tieback anchor bars installed by Redstone began to shear off at the face of the wall.

20. JFA, and not Redstone, had responsibility for placing backfill material behind the wall and over the tieback anchor bars.

21. Redstone's investigation revealed that the shearing of these particular tieback anchor bars was the result of JFA having improperly placed fill material over

them and fill settlement that caused downward movement of the anchors which resulted in the anchors shearing off at the precast concrete facing.

22. When Redstone approached JFA about the costs associated with making repairs as a result of the improper backfill placement, JFA contended that those costs were Redstone's responsibility.

23. However, Redstone had installed all anchors according to the design specifications outlined by Amec, and an Amec inspector oversaw every installation made by Redstone, who confirmed Redstone's proper installation. Even Defendant Amec acknowledged that improper placement of fill was the cause of the shearing. JFA's only response when presented with these facts was to threaten termination of Redstone if the anchors were not repaired.

24. In addition to these issues, Redstone also encountered a change in subsurface conditions on one section of the wall.

25. In this specific area, Redstone encountered a rock formation in the anchor bond zone that had running water through the fractures in the rock that caused the grout to be washed away due to the lack of head pressure caused by horizontal installation of anchors per Amec's design.

26. Having been made aware of this change in conditions by Redstone, Amec determined that a significantly longer bond zone and/or a completely redesigned anchor would have to be used that would include installing the replacement anchors at 10 degrees off horizontal as well as extending the length of the bond zone to use the head pressure of the grout to seal off the water. This created yet another change in the contractual scope of Redstone's work.

27. JFA directed Redstone to complete this new work, but failed to approve the change in work price that Redstone requested on numerous occasions.

28. On numerous other occasions, due to under or improper design of portions of the wall as well as changed conditions, additional adjustments were made to Amec's design that required Redstone to perform extra work not outlined in the original specifications.

29. Redstone presented all of these issues to JFA and Amec, did the additional work as directed, and concurrently and accordingly requested additional compensation. However, again, Redstone received no response from Defendants regarding the requested change orders. Instead, Redstone received a threat of termination if it did not continue to work despite a lack of compensation for work beyond the original scope of its contract.

30. Finally, Redstone sent a demand letter for payment for the extra work or an explanation of why JFA would not pay for the extra work. Significantly, Redstone had been seeking a response for many of these issues for more than six (6) months, but had never received a definitive response from JFA. Ultimately, JFA's response was to again threaten termination. Moreover, upon information and belief, JFA approached several of Redstone's key employees in an attempt to lure them to become employees of JFA.

31. In addition, when it became apparent that JFA had no intention of abiding by its contractual obligations and that a dispute between the parties was inevitable, JFA undertook a series of actions intended to interfere with Redstone's favorable contractual and other business relations.

32. Among other actions, JFA made direct contact with Redstone employees, encouraging them to leave Redstone's employment and in at least one instance, advising a Redstone employee that JFA intended to terminate the Subagreement even before Redstone management had been notified of that intent.

33. Similarly, JFA engaged in communications with Project owner MarkWest intended to harm Redstone's reputation with MarkWest. For instance, Redstone was informed that JFA actually went to MarkWest to request that Redstone be thrown off the Project for safety reasons, despite the fact that no safety issues had ever occurred, and certainly had never been raised with Redstone. Upon information and belief, JFA made this request of MarkWest through a JFA representative's personal relationship with someone at MarkWest. Again, upon information and belief, this request was made with the intent of undermining Redstone's credibility and reputation in advance of the likely pending litigation.

34. Moreover, JFA proactively made contact directly with Redstone's vendors and suppliers for the purpose of damaging Redstone's advantageous relations with them.

35. Additionally, JFA removed a portion of the work from Redstone's contract scope (the testing of certain anchors) based upon the pretense that Redstone supposedly had not met JFA's scheduling requirements for that work. In fact, Redstone was working 24 hours a day/7 days a week to complete this work, but was prevented from doing so because JFA had placed a machine in order to physically block Redstone from completing this work. Redstone contends that the remainder of this work would have taken no more than thirty-six (36) hours to complete if JFA had allowed Redstone to proceed with double shift work as planned.

36. Instead, JFA brought in a third party to complete this "critical" work on a single shift basis. Upon information and belief, that third party left the project after three days without having completed any of the necessary testing, and JFA did not bring in anyone else to complete this "critical" work.

37. Redstone pointed out to MarkWest that this was simply a posturing exercise by JFA to undermine Redstone's credibility with MarkWest and others and that Redstone had the necessary resources and equipment available to complete the testing. As of the date of Redstone's termination from the entire job, no "critical" testing of these anchors had been accomplished.

38. On July 6, 2015, Redstone notified JFA that it had completed its base contractual responsibility to install a 32,026.4 square foot of wall and that a change order would be required to continue installing square footage. Nevertheless, Redstone continued to work and install additional wall as directed by JFA pursuant to JFA's evolving design requirements. Redstone continued to request a response to the square footage issue, and Redstone continued to progress the project in an effort to meet JFA's requirements in a good faith understanding that the contract clearly defined the scope of the size of the wall at 32,026.4 square feet, and with all parties obviously understanding that the unanticipated increasing size of the wall required the expenditure of significant additional materials, labor and costs.

39. Redstone has not been paid for even the base scope of work for which it contracted, let alone the extra work that resulted from JFA's breach of the Subagreement and Amec's faulty design work. When Redstone finally demanded an answer as to

whether it would be compensated for this additional work it had already performed, JFA's response was to terminate the Subagreement.

40. Significantly, the notice of that termination in and of itself violated the terms of the Subagreement, coming as it did only six (6) days after JFA first contended that, by refusing to work for free, Redstone was somehow in violation of the terms of the Subagreement.

## COUNT I FOR BREACH OF CONTRACT AGAINST JFA

41. Redstone incorporates Paragraphs 1 through 40 above as if set forth fully herein.

42. By refusing to pay sums due and owing under the Subagreement, by failing to pay for extra work beyond the scope of the Subagreement, by improperly removing other work from the scope of the Subagreement, by improperly placing backfill behind the wall and then refusing to acknowledge the damage caused by that action, by refusing to acknowledge the change in conditions that led to the need for a change in anchor design, by improperly terminating Redstone's performance under the Subagreement, and by refusing and failing to abide by the covenant of good faith and fair dealing inherent in all contracts, JFA is in breach of the Subagreement.

43. As a result of those breaches, Redstone has suffered serious damages, including, but not limited to, money damages for work that it performed but was not paid.

44. Those money damages exceed $75,000.

45. In addition, Redstone is entitled to prejudgment interest on those damages, as well as any and all other relief to which the Court may conclude Redstone is entitled.

WHEREFORE, Redstone asks for a judgment against JFA in an amount in excess of $75,000, as well as prejudgment interest and any and other relief to which it is entitled.

### COUNT II FOR NEGLIGENCE OF AMEC

46. Redstone incorporates Paragraphs 1 through 40 above as if set forth fully herein.

47. As noted above, the Project was a Design/Build Project, and Defendant Amec was the design professional of record.

48. As the design professional of record, Amec knew, or had reason to know, that a subcontractor such as Redstone would rely upon its design effort to both bid for and perform the contract work at issue.

49. Amec breached its duty by under-designing portions of the wall. The walers were lacking required stiffeners, causing Redstone to perform additional work and add additional materials to the wall.

50. As a result of this breach, at this time Redstone has suffered serious damages, including, but not limited to, money damages for work that it performed but was not paid. Further damages are being evaluated as various aspects of the engineering on the wall are being evaluated.

51. Those money damages exceed $75,000.

52. In addition, Redstone is entitled to prejudgment interest on those damages, as well as any and all other relief to which the Court may conclude Redstone is entitled.

WHEREFORE, Redstone asks for a judgment against Amec in an amount in excess of $75,000, as well as prejudgment interest and any and other relief to which it is entitled.

### COUNT III FOR TORTIOUS INTERFERENCE AGAINST JFA

53. Redstone incorporates Paragraphs 1 through 40 above as if set forth fully herein.

54. Prior to and during the initial performance of the Subagreement, Redstone enjoyed advantageous contractual and business relations with MarkWest and with Redstone's various vendors and suppliers to the Project, as well as its labor force.

55. In an effort to harm Redstone, JFA intentionally interfered with those relationships by wrongfully withholding monies due and owing Redstone with which it could pay its vendors and suppliers, by directly undermining Redstone's relationships with certain of its employees, and by actively seeking to falsely undermine Redstone's performance of the Subagreement with Mark West.

56. As a result of JFA's active acts of interference, Redstone has had several employees leave, has seen its vendor and supplier relations severely damaged, including through higher pricing and less responsiveness on other contract bids and work, and has had its reputation as a quality geotechnical contractor with MarkWest severely harmed as a result of having to lien the Project premises due to nonpayment by JFA.

57. JFA committed these acts of tortious interference intentionally and for the sole purpose of causing harm to Redstone, and JFA acted without privilege or justification.

58.     As a result of those acts, Redstone has suffered serious damages, including, but not limited to, money damages for lost opportunity costs, and injury to its reputation as a commercial business and as an employer.

59.     Those money damages exceed $75,000.

60.     In addition, Redstone is entitled to prejudgment interest on those damages, as well as an award of punitive damages for JFA's intentional tortious conduct, and as well as any and all other relief to which the Court may conclude Redstone is entitled.

WHEREFORE, Redstone asks for a judgment against JFA in an amount in excess of $75,000, as well as prejudgment interest, punitive damages and any other relief to which it is entitled.

**Trial by jury is demanded.**

Respectfully submitted,

*/s/ Bruitt*

Bruce E. Stanley (WVSB No. 5434)
Alicia Schmitt (WVSB No. 12333)
Stanley & Schmitt PC
2424 Craftmont Avenue
Pittsburgh, PA 15205
T: (412) 401-4654
bruce@stanleyschmittlaw.com
alicia@stanleyschmittlaw.com

*Attorneys for Plaintiff*

Dated:  August 24, 2015